ORDERED.

**Dated: November 02, 2026**

Luis E. Rivera II
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION
www.flmb.uscourts.gov

In re:

Keith Allen Malinowski, and
Danielle Marie Lipani,

Debtors.
_________________________________/

Case No. 2:26-bk-00617-FMR
Chapter 7

**MEMORANDUM OPINION AND ORDER SUSTAINING CHAPTER 7 TRUSTEE'S OBJECTION TO DEBTORS' CLAIM OF EXEMPTIONS**

Before the Court is the *Chapter 7 Trustee's Objection to Debtors' Claim of Exemptions* (the "**Objection to Exemptions**")[1] filed by Eric Jacobs, as Chapter 7 Trustee (the "**Trustee**"), and the *Debtors' Response to Chapter 7 Trustee's Objection to Debtors' Claims of Exemption* (the "**Debtors' Response**")[2] filed by Keith Allen Malinowski and Danielle Marie Lipani (the "**Debtors**").

[1] Doc. No. 11.
[2] Doc. No. 13.

The Trustee objects to the Debtors' claimed exemption of $46,174.33 in publicly traded stocks held in a Charles Schwab brokerage account.[3] The Debtors claim the stocks as exempt because they are traceable to an exempt Public Safety Officers' Benefits Program ("**PSOB Program**") award.[4] In turn, the Trustee objects, arguing that investing the award proceeds in publicly traded stocks changed their character and extinguished the exemption.[5]

The Court heard oral argument on the Trustee's objection and the Debtors' response on August 13, 2026, and took the matter under advisement.[6]

The question is whether the stocks retain the exempt status of the PSOB Program award merely because they are traceable to it. The Court concludes that they do not. The Debtors changed the character of the exempt asset when they used the award proceeds to purchase stocks. The Court therefore sustains the Trustee's objection. This memorandum opinion constitutes the Court's findings of fact and conclusions of law under Federal Rule of Bankruptcy Procedure 7052, made applicable to this contested matter by Rule 9014(c)(1).

---

[3] Doc. No. 11 ¶ 7.
[4] *See generally* Doc. No. 13.
[5] Doc. No. 11 ¶ 7.
[6] Doc. No. 25.

## I. Background[7]

The Debtors filed for relief under chapter 7 of the Bankruptcy Code[8] on March 20, 2026.[9] On Schedule A/B they disclosed two assets traceable to a PSOB Program award: $279,910.97 in Wells Fargo savings account ending in 4556 (the "**PSOB Funds**")[10] and $46,337.60 in a Charles Schwab brokerage account (the "**Stocks**").[11] The Debtors claimed both assets as exempt under Fla. Stat. § 222.18.[12]

Before the bankruptcy, Mr. Malinowski received a disability benefit under the Public Safety Officers' Benefits Act ("**PSOB Act**").[13] Codified at 34 U.S.C. § 10281 - 10308, the PSOB Act established the PSOB Program to provide "death and education benefits to survivors of fallen law enforcement

[7] These facts and background are undisputed and drawn from the record. At the hearing held August 13, 2026, Debtor's counsel indicated "I don't think there's a factual issue here, Your Honor - at all. It is clear what the Debtor did." Doc. No. 20.
[8] 11 U.S.C. § 101 - 1532 (the "**Bankruptcy Code**" or the "**Code**"). Unless otherwise indicated, all statutory references are to the Bankruptcy Code.
[9] *Voluntary Petition* (Doc. No. 1).
[10] Doc. No. 1, at 13.
[11] *Id.*
[12] *Id.* at 18-19.
[13] *See* Doc. No. 1, at 53 (disclosing Debtors had received income from "Pensions & Annuities" in the amount of $448,575.00 during calendar year 2025). The PSOB Program benefit amount was $448,575.00 for eligible deaths and catastrophic disabilities between October 1, 2024, and September 30, 2025. Bureau of Just. Assistance, U.S. Dep't of Just., *Benefits by Year, Public Safety Officers' Benefits Program*, https://bja.ojp.gov/program/psob/ resources/benefits-by-year (last visited Oct. 12, 2026).

officers, firefighters, and other first responders, and disability benefits to officers catastrophically injured in the line of duty."[14]

The Debtors kept the award proceeds in segregated Wells Fargo accounts: checking account ending in 8617 and savings account ending in 4556.[15] But, on October 15, 2025, they transferred $50,000 of the award proceeds to a Charles Schwab brokerage account and later used those funds to purchase the Stocks.[16] The Debtors manage the brokerage account themselves and "day trade," selecting which stocks to buy and sell.[17] No other funds have been deposited into or withdrawn from the brokerage account and the date of filing value of the stocks in the account is $46,337.60.[18] It is undisputed the PSOB Funds held at Wells Fargo are traceable to PSOB Program award proceeds.

On May 21, 2026, the Trustee timely objected to the claimed exemption of the Stocks.[19] He contends that the stocks no longer share the award's exempt character: "After the Debtors transferred the PSOB funds into a Charles

[14] Bureau of Just. Assistance, U.S. Dep't of Just., *Public Safety Officers' Benefits Program*, https://bja.ojp.gov/program/psob (last visited Oct. 12, 2026).
[15] *See* Doc. No. 1, lines 17.4 & 18.
[16] Doc. No. 11 ¶ 6; Doc. No. ¶ 9.
[17] *See id.* ¶ 7 note 1 ("The Debtors testified during the 341 meeting that they individually manage this account and determine which stocks to buy and sell.").
[18] Doc. No. 13 ¶ 29.
[19] Doc. No. 11. The meeting of creditors was held and concluded on April 21, 2026. Consequently, the deadline to file an objection to a claimed exemption was May 21, 2026 – "30 days after . . . the conclusion of the § 341 meeting of creditors." Fed. R. Bankr. P. 4003(b)(1).

Schwab brokerage account, the funds were invested in stocks of various publicly traded companies, or otherwise converted, which have caused them to lose their exempt character."[20]

The Debtors oppose the Objection to Exemptions.[21] They argue that "investment, standing alone, is not commingling, is not dissipation, and is not loss of traceability."[22] Relying on several Florida decisions, they assert that "[e]xempt proceeds need not sit idle in a non-interest-bearing account to retain their exempt status."[23] In their view, depositing the proceeds into a brokerage account and investing them does not defeat the exemption's purpose.[24]

## II. Analysis

Courts generally construe state and federal bankruptcy exemption statutes liberally in favor of debtors.[25] But exemptions strike "a careful balance between the interests of creditors and debtors."[26] They protect debtors' ability to meet basic needs and obtain a fresh start.[27] But, as the Supreme Court explained in *Schwab v. Reilly*, "every asset the Code permits a debtor to

---

[20] Doc. No. 11 ¶ 7.
[21] *See generally* Doc. No. 13.
[22] *Id.* ¶ 12.
[23] *Id.* ¶ 21.
[24] *Id.* ¶ 28.
[25] *See In re McFarland*, 790 F.3d 1182, 1186 (11th Cir. 2015) ("Generally speaking, courts construe bankruptcy exemption statutes—both state and federal—liberally in favor of bankruptcy debtors.").
[26] *Clark v. Rameker*, 573 U.S. 122, 124, 134 S. Ct. 2242, 189 L. Ed. 2d 157 (2014).
[27] *See Rousey v. Jacoway*, 544 U.S. 320, 325, 125 S. Ct. 1561, 161 L. Ed. 2d 563 (2005) (explaining that the Bankruptcy Code permits a debtor to exempt certain property "[t]o help the debtor obtain a fresh start").

withdraw from the estate is an asset that is not available to his creditors."[28] Even so, exempt funds do not necessarily retain their protection when used to acquire other assets. Depending on the governing statute, converting those funds into nonexempt property or investments may extinguish the exemption.[29]

Section 522(b) establishes two alternative exemption schemes for debtors in bankruptcy. Unless applicable state law bars the choice, a debtor may elect either (i) the federal exemptions listed in section 522(d) or (ii) the exemptions available under applicable state law *and* federal law other than section 522(d).[30] Florida has "opted out" of the § 522(d) scheme,[31] while expressly permitting debtors to claim the exemptions listed in § 522(d)(10) in addition to the exemptions available under Florida law.[32] Florida debtors therefore may only claim state-law exemptions *and* federal nonbankruptcy exemptions.

---

[28] *Schwab v. Reilly*, 560 U.S. 770, 791, 130 S. Ct. 2652, 2667, 177 L. Ed. 2d 234 (2010).

[29] *See* Peter Spero, *Fraudulent Transfers, Prebankruptcy Planning and Exemptions* § 12:4 (2006) ("Where the proceeds are used to make investments, however, the exemption may be lost as not being consistent with the purpose of the exemption.").

[30] 11 U.S.C. § 522(b)(1). *See Matter of Treadwell*, 699 F.2d 1050, 1052 (11th Cir. 1983) ("Under 11 U.S.C.A. § 522(b), a debtor filing for bankruptcy may . . . either take the exemptions specified in the Code itself, 11 U.S.C.A. § 522(d), unless state law prohibits this option, or, in the alternative, he may take the exemptions provided by other federal statutes and state law." (cleaned up)).

[31] *See* Fla. Stat. § 222.20 ("residents of this state shall not be entitled to the federal exemptions provided in s. 522(d) of the Bankruptcy Code of 1978 (11 U.S.C. s. 522(d))").

[32] *See* Fla. Stat. § 222.201(a) ("Notwithstanding s. 222.20, an individual debtor under the federal Bankruptcy Reform Act of 1978 may exempt, in addition to any other exemptions allowed under state law, any property listed in subsection (d)(10) of s. 522 of that act.").

### A. The Debtors Claimed the Wrong Exemption

The Debtors claim the PSOB Funds and the Stocks as exempt under Fla. Stat. § 222.18. But the Debtors claimed the wrong exemption. That statute protects disability income benefits payable under an insurance policy or contract—not every payment made because of a disability.[33]

Section 222.18 provides:

> **Exempting disability income benefits from legal processes.—** Disability income benefits under any policy or contract of life, health, accident, or other insurance of whatever form, shall not in any case be liable to attachment, garnishment, or legal process in the state, in favor of any creditor or creditors of the recipient of such disability income benefits, unless such policy or contract of insurance was effected for the benefit of such creditor or creditors.[34]

The statute imposes two threshold requirements: the payment must be a disability income benefit, and it must arise "under" a policy or contract of insurance.[35] But, here, Mr. Malinowski's PSOB Program award arose under a federal statute, not an insurance policy or contract. It is a statutory benefit administered by the Bureau of Justice Assistance and thus falls outside Fla. Stat. § 222.18.[36]

---

[33] *In re Chesley*, 526 B.R. 888, 895 (M.D. Fla. 2014).
[34] Fla. Stat. § 222.18.
[35] *In re Chesley*, 526 B.R. at 895 (finding the statute contains two distinct requirements: (1) the benefits must be disability income benefits, and (2) those benefits must be payable under a policy or contract of insurance.).
[36] 34 U.S.C. §§ 10281 - 10308.

This conclusion is consistent with the Florida Supreme Court's interpretation of Fla. Stat. § 222.18 in *Zuckerman v. Hofrichter & Quiat, P.A.*[37] There, the Court explained that the phrase "of whatever form" protects disability insurance benefits regardless of the form of payment, including benefits paid through a lump-sum settlement.[38] That phrase broadens the permissible form of payment; it does not dispense with the requirement that the payment arise under an insurance policy or contract.

Neither the award's connection to a disability nor its payment in a lump sum satisfies the requirement that the payment arise under an insurance policy or contract. The Debtors therefore cannot exempt the PSOB Funds or the Stocks under Fla. Stat. § 222.18.

**B. PSOB Program awards are exempt under 34 U.S.C. § 10281(g)**

Although Fla. Stat. § 222.18 does not protect the PSOB Funds or the Stocks, federal nonbankruptcy law provides a separate basis to exempt a PSOB Program award. The PSOB Act authorizes lump-sum benefits for eligible public safety officers who sustain a permanent and total disability.[39] It also expressly protects benefits already paid: "No benefit paid under this subchapter shall be subject to execution or attachment."[40]

[37] *Zuckerman v. Hofrichter & Quiat, P.A.*, 646 So. 2d 187 (Fla. 1994).
[38] *Id.* at 188.
[39] 34 U.S.C. § 10281(b).
[40] 34 U.S.C. § 10281(g).

That protection resembles the Social Security Act's protection of benefits from execution, attachment, and other legal process, although the Social Security Act goes further by expressly addressing bankruptcy.[41] And both provisions protect benefits after payment, not merely the right to receive them. Here, the PSOB Funds remain identifiable award proceeds held in the Debtors' savings account. The PSOB Funds are therefore exempt from property of the estate under 34 U.S.C. § 10281(g).

**C. Tracing is Not Enough: *Porter* and *Philpott***

Whether the Stocks remain exempt under 34 U.S.C. § 10281(g) presents a different question, governed by federal law.[42] Two Supreme Court decisions provide the framework to answering this question: *Porter v. Aetna Cas. and Sur. Co.*,[43] and *Philpott v. Essex Cnty. Welfare Bd.*[44] Together, they distinguish benefits that retain their character as money from benefits converted into investments.

In *Porter*, the Court considered whether veterans' benefits deposited in federal savings and loan accounts remained exempt under 38 U.S.C.

---

[41] 42 U.S.C. § 407(a) ("[N]one of the moneys paid or payable or rights existing under [the Social Security Act] shall be subject to execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or insolvency law.").

[42] *Cf. In re Lazin*, 217 B.R. 332, 334–35 (Bankr. M.D. Fla. 1998) (noting Social Security benefits arise under a federal nonbankruptcy statute and thus the exemption is analyzed under federal law).

[43] *Porter v. Aetna Cas. & Sur. Co.*, 370 U.S. 159, 82 S. Ct. 1231, 8 L. Ed. 2d 407 (1962).

[44] *Philpott v. Essex Cnty. Welfare Bd.*, 409 U.S. 413, 93 S. Ct. 590, 34 L. Ed. 2d 608 (1973).

§ 3101(a).[45] There the Court held they did.[46] Its analysis turned not simply on the source of the deposits, but on whether the funds retained the "quality of moneys" or had become permanent investments.[47]

That distinction emerged from three earlier decisions.[48] In *Trotter v. Tennessee*,[49] the Court explained that the exemption "spent its force when the benefit funds lost the quality of moneys and were converted into permanent investments."[50] In *Lawrence v. Shaw*,[51] however, bank deposits traceable to veterans' benefits remained exempt because they were available on demand for the veteran's support and maintenance.[52] And in *Carrier v. Bryant*,[53] government notes and bonds purchased with veterans' benefits and "held as investments" lacked federal statutory protection.[54]

Applying those precedents, *Porter* focused on the practical characteristics and use of the accounts.[55] There, the funds were available as

---

[45] *Porter*, 370 U.S. at 159–60.
[46] *Porter*, 370 U.S. at 162.
[47] *Id.*
[48] *Porter*, 370 U.S. at 160–62.
[49] *Trotter v. State of Tennessee, for Use & Benefit of Blount Cnty., Tenn.*, 290 U.S. 354, 54 S. Ct. 138, 78 L. Ed. 358 (1933).
[50] *Porter*, 370 U.S. at 160.
[51] *Lawrence v. Shaw*, 300 U.S. 245, 57 S. Ct. 443, 81 L. Ed. 623 (1937).
[52] *See Porter*, 370 U.S. at 161 (noting the test to be "whether as so deposited the benefits remained subject to demand and use as the needs of the veteran for support and maintenance required").
[53] *Carrier v. Bryant*, 306 U.S. 545, 59 S. Ct. 707, 83 L. Ed. 976 (1939).
[54] *Porter*, 370 U.S. at 161.
[55] *See id.* at 161-62 (considering the practical characteristics and use of the accounts at issue, as opposed to "the technicalities of title and other formalities").

promptly as money in a checking account, and federal supervision and insurance assured the deposits' integrity.[56] The funds thus afforded "immediate and certain access" and retained "the quality of moneys."[57] They were neither "of a speculative character nor were they time deposits at interest."[58] Actual withdrawals for support and maintenance further confirmed that the accounts served as a ready source of funds rather than as permanent investments.[59] The Court held the benefits therefore remained exempt.[60]

In *Philpott*, the Court applied *Porter*'s reasoning to Social Security benefits deposited in a bank account.[61] Because the funds "were readily withdrawable and retained the quality of 'moneys'," they remained protected under 42 U.S.C. § 407.[62]

---

[56] *See id.* at 161 ("[T]he District Court found that a withdrawal from the accounts here involved could be made 'as quickly as a withdrawal from a checking account . . . .' In addition, the integrity of the deposits was assured by federal supervision of the associations plus federal insurance of the accounts.").
[57] *Id.* at 161–62.
[58] *Id.* at 162.
[59] *See id.* (noting "that at times petitioner drew moneys from the savings and loan fund for his support and maintenance requirements").
[60] *See id.* (concluding "that deposits such as are involved here should remain inviolate").
[61] *Philpott*, 409 U.S. at 416.
[62] *Id.*

And, relying on *Porter* and *Philpott*, Courts have likewise recognized that depositing identifiable federal benefits into a bank account does not, by itself, relinquish exempt status.[63]

But benefits converted into permanent investments may lose their protection even when their source is undisputed.[64] And the ability to trace an asset to exempt benefits does not necessarily protect tangible property purchased with those benefits.[65] The question, then, is not merely where the funds came from, but what they became: money readily available for support and maintenance, or an investment that no longer retains that character.

**D. The Stocks are Permanent Investments**

As in *Porter* and the decisions applying it, the Court looks to the practical characteristics and use of the Stocks to determine whether they retain the "quality of moneys," with immediate and certain access for support and maintenance, or whether the Debtors converted the PSOB Program award

---

[63] *See, e.g.*, *In re Cook*, 406 B.R. 770, 773 (Bankr. S.D. Ohio 2009) (relying on *Porter*, holding "the funds in the bank accounts traceable to the federal veteran benefits are exempt"); *In re Lazin*, 217 B.R. at 445 (permitting debtor to claim an exemption in Social Security benefits accumulated in a bank account subject to a showing that the benefits are needed for basic care and maintenance); *In re Ryzner*, 208 B.R. 568, 570 (Bankr. M.D. Fla. 1997) (same); *In re Crandall*, 200 B.R. 243 (Bankr. M.D. Fla. 1995) (same).

[64] *See Porter*, 370 U.S. at 161 (citing *Carrier* and recognizing that government bonds purchased with veterans' benefits and "held as investment" lose their exemption).

[65] *See In re Bonam*, No. 1:22-CV-150, 2023 WL 4588794, at *2 (S.D. Ga. July 18, 2023) (holding bankruptcy court did not err when it concluded a vehicle purchased with prepetition social security funds is not exempt under 42 U.S.C. § 407); *In re Franklin*, 506 B.R. 765, 776 (Bankr. C.D. Ill. 2014) ("The protection of [42 U.S.C.] § 407 does not extend to tangible property purchased with social security proceeds, even if the property is traceable to the proceeds.").

proceeds into permanent investments.[66] Under that framework, the Court concludes the Stocks do not retain the award's exempt character.

The source of the original funds used to purchase the Stocks is undisputed. The Debtors used $50,000 of the PSOB Program award to acquire the stocks, which they "day trade" through the Charles Schwab brokerage account.[67] But tracing the Stocks to the PSOB Program award establishes only their source—not their continued exemption. Under *Porter*, benefits only remain protected when they retain the quality of money available for support and maintenance; protection does not extend to benefits converted into permanent investments.[68]

The Debtors' stock purchases crossed that line. Unlike money held in a deposit account, the Stocks are investments whose value depends on market

[66] *See, e.g.*, *Philpott*, 409 U.S. at 416 (holding social security benefits deposited in bank account retained exemption because funds were readily withdrawable, retained the quality of "moneys," and were not a permanent investment); *In re Franklin*, 506 B.R. 765, 776 (Bankr. C.D. Ill. 2014) (noting that "the protection afforded by § 407 to Social Security proceeds remains subject to the condition that the proceeds retain the quality of moneys"); *In re Lazin*, 217 B.R. at 334–35 (applying *Porter* and *Philpott* to analyze a Social Security benefits exemption including whether the funds had been used to make a "permanent investment" and retained the "quality of moneys"). *See also In re Turner*, No. 91-10825, 1992 WL 12004368 (Bankr. S.D. Ga. Jan. 29, 1992) (exemption for a veteran's benefit did not include mobile home purchased with it); *Bischoff v. Bischoff*, 987 S.W.2d 798 (Ky. Ct. App. 1998) (Veterans' Administration disability benefits lost their exempt status when invested in the parties' residence).

[67] *See* Doc. No. 1, at 13 ("Debtors transferred $50,000 of PSOB money into this account on October 15, 2025[.]"), and Doc. No. 11 ¶ 7 ("After the Debtors transferred the PSOB funds into a Charles Schwab brokerage account, the funds were invested in stocks of various publicly traded companies, or otherwise converted.").

[68] *Porter*, 370 U.S. at 161–162.

conditions.[69] To obtain money for support and maintenance, the Debtors must sell the Stocks, potentially at a gain or a loss.[70] The ability to sell an investment does not give it the same character as money available on demand.[71] That portion of the PSOB Program award used to purchase the Stocks is no longer money available on demand for support and maintenance. Instead, it is an investment that must be sold at market prices to produce money. The Stocks therefore lack the immediate and certain availability that supported the exemption in *Porter*.[72]

## IV. Conclusion

The PSOB Act protects a "benefit paid under this subchapter" from execution or attachment.[73] Here, the Debtors used $50,000 of the otherwise exempt PSOB Program award to purchase publicly traded stocks for investment. In doing so, they changed the character of those proceeds. Despite being traceable to the award, the Stocks no longer retain the quality of money

---

[69] *See generally* Editors of Kiplinger's Personal Finance, *The Basics for Investing in Stocks* 1 (2015), https://dfi.wa.gov/sites/default/files/publications/stocks-2015_0.pdf ("Common stocks represent a share of ownership in the company that issues the shares . . . . Stock prices move according to how a company performs, how investors perceive the company's future and the movement of the overall stock market.").

[70] *Id.*

[71] *See generally* U.S. Sec. & Exch. Comm'n, *Executing an Order*, Investor.gov, https://www.investor.gov/introduction-investing/investing-basics/how-stock-markets-work/executing-order (last visited Oct. 16, 2026) (explaining that trade execution is not instantaneous because an investor's order passes through a broker before reaching a market, during which time the stock price may change).

[72] *Id.* at 161–62.

[73] 34 U.S.C. § 10281(g).

that preserves the exemption after payment.[74] The Stocks therefore are not exempt under 34 U.S.C. § 10281(g).

The Court therefore will sustain the Trustee's objection and disallow the Debtors' claimed exemption of the Stocks. The Debtors will have thirty days to repurchase the Stocks from the bankruptcy estate or surrender them to the Trustee for liquidation.

Accordingly, it

**ORDERED** that:

1. The Trustee's Objection to the Debtors' Claims of Exemption (Doc. No. 11) is **SUSTAINED** as set forth herein.

2. The Debtors' claimed exemption of the Stocks is **DISALLOWED**.

2. The Debtors shall repurchase the Stocks from the bankruptcy estate or surrender them to the Trustee within thirty days after entry of this Order.

Trustee Eric Jacobs is directed to serve a copy of this order on interested parties who do not receive service by CM/ECF and file a proof of service within three days of entry of the order.

---

[74] *See Trotter*, 290 U.S. at 356–57 (holding exemption ended when veterans' benefits lost the "quality of moneys" and were converted into land and buildings, and that the statute did not extend immunity to "permanent investments"); *Lawrence*, 300 U.S. at 250–51 (holding ordinary bank deposits traceable to veterans' benefits, subject to withdrawal on demand for the veteran's use, remained exempt until expended or invested); *Carrier*, 306 U.S. at 545–47 (holding negotiable notes and United States bonds purchased with veterans' benefits and held as investments were not exempt from execution on a judgment).